## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANTHONY JOSEPH<br>604 Gregg Street<br>Shillington, PA 19607 | : CIVIL ACTION – LAW<br>:<br>: NO. 5:22-cv-04049-KBH<br>: |
| Plaintiff, | :<br>: |
| vs. | :<br>: |
| PEPPERIDGE FARM INCORPORATED<br>595 Westport Avenue<br>Norwalk, Connecticut 06851 | : JURY TRIAL OF 12 DEMANDED<br>:<br>: |
| Defendant. | : *Electronically filed* |

### AMENDED COMPLAINT

### JURISDICTION AND VENUE

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 as the action arises under Title VII, 42 U.S.C. §2000e, *et seq*. 42 U.S.C. §19, 29 U.S.C. §621-634 and inasmuch as the matters in controversy are brought pursuant to the federal claims of Title VII, Section 1981, and the Age Discrimination in Employment Act ("ADEA"). Plaintiff's Notice of Right to Sue letter was issued July 21, 2022 and is attached as Exhibit A. This Complaint was filed within 90 days of receipt of that Notice. Plaintiff cross-filed this matter under the Pennsylvania Human Relations Act, 43 Pa.C.S. §951, *et seq*., with the Pennsylvania Human Relations Commission and it has not been one year since that cross-filing. Plaintiff seeks the Court to deem this action filed when one year has passed. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367 because they are so related to the federal claims that form part of the same case.

2. Venue is proper in the Eastern District of Pennsylvania because Defendant is located in this District.

1

## FACTUAL ALLEGATIONS

3.      Plaintiff is Anthony Joseph, an adult individual and a resident of the Commonwealth of Pennsylvania.  He resides in Berks County presently at 604 Gregg Street, Shillington, Pennsylvania, 19607.

4.      Defendant, Pepperidge Farm Incorporated is a corporation with their corporate headquarters located at 595 Westport Avenue, Norwalk, Connecticut 06851. Plaintiff worked at a Pepperidge Farm plant located at 2195 North Reading Road, Denver, PA, 17517.

5.      Plaintiff's race is African-American, his color is black, and his age at the time of his termination was fifty-nine.

6.      Plaintiff has been retaliated and discriminated against by Defendant because of race, color and age.

7.      Plaintiff worked at Defendant for thirty-five (35) years.

8.      Over the last several years in particular, given his longstanding tenure at the company, Plaintiff brought numerous issues to Human Resources at Pepperidge Farm and later to Corporate Management, about differing treatment because of race at the Denver plant.

9.      The complaints were generally that both he and other African-American/black employees were treated differently at the Denver plant in Lancaster, including discipline and promotions.

10.     Further, Plaintiff raised various other race-based issues such as not allowing Black employees to wear political clothing (e.g., Black Lives Matter masks) versus allowing White employees to wear Trump election hats or Trump shirts and the way Human Resources personnel and managers spoke to black employees, among other issues.

11.     Plaintiff's goal was to improve racial relations, and reduce, if not eliminate, unequal application of the Defendant's policies and procedures.

12.     The Human Resources officials onsite at the time were, Sherry Cook, and her supervisor, Chris Martin. Rick Peiffer was, and may still be, the Plant Manager.

13.     Plaintiff brought his concerns to all three of Defendant's employees over recent years about differing racial treatment but there was no avail.  This caused him to reach out to Corporate (2019/2020) and specifically, Brittany Morris, the Senior Vice President of Corporate Human Resources via phone and email, regarding his complaints of how he was treated differently and written up for things white employees were not disciplined for.

14.     On February 8, 2020, Plaintiff was called to Human Resources based on false claims that he spread rumors about infidelity between a supervisor and subordinate on another shift.

15.     Plaintiff denied this emphatically.  He complained to upper management about being falsely accused of three work place incidents in the past year.

16.     Plaintiff further indicated that these complaints were race-based.

17.     Brittany Morris talked to Mr. Joseph for 45 minutes on his perceptions of the Denver plant and then later included him in a conference call with herself and Chris Martin.

18.     In mid-March 2020, Plaintiff had conversations with Brittany Morris and Chris Martin respectively. In those conversations, Plaintiff's racial concerns were discussed.  He indicated there was a lack of integrity at Denver's Human Resources Department in dealing with racial complaints. At one point around this time, Chris Martin called him into the Denver HR office and said "I hear you are calling me a racist."  Mr. Joseph denied this and said she was a selective racist.  He urged her to look up what that term means.  However, she continued to appear offended.

3

19.     After Plaintiff reached out to Ms. Morris, the local managers somewhat backed off Plaintiff for a period of time.

20.     About six (6) months later, activity against Plaintiff resumed.

21.     Plaintiff continued to raise the issue that white employees were treated better, particularly in terms of disciplinary issues.

22.     Plaintiff always kept notes in his locker documenting his past incidents.   His notes were taken from his locker when he was suspended.

23.     In September 2021, Plaintiff told Human Resources Representative, Sherry Cook, that she was a "selective racist" because she was unequally addressing complaints and discipline at the Denver plant in an incident with a Caucasian employee, Mark Hughes.

24.     Mark Hughes would sabotage machines for other employees.

25.     Mark Hughes would yell in the face of a black employee, Karen Cox.

26.     Plaintiff witnessed the event and was called into Human Resources as a witness.

27.     Plaintiff told them his experience with Mark Hughes was that of sabotaging another employees' equipment.

28.     When Ms. Cook asked, "Why didn't you report it?", Plaintiff responded that Ms. Cook had told him on one occasion he had lied and he raised into question once again the claim of selective racism.

29.     Plaintiff called Ms. Cook a "selective racist" for having no integrity in her failure to address repeated concerns about race and discriminatory practices in the workplace.

30.     A month later he was terminated.

31.     Three weeks before his firing on October 26, 2021, Plaintiff had a conversation with upper Manager, Rich Peifer. Mr. Peifer asked him, "How can we make things right in the plant?" Plaintiff said Pepperidge Farm had "to stop nailing people for petty stuff."

4

32.     Three weeks later, Plaintiff was fired for a trivial incident for which other similarly situated Caucasian and white individuals were not fired.

33.     Plaintiff was sent home after moving a cart with his forklift a small distance when it was in his way.

34.     An employee named Kenny Jones (Caucasian) saw the incident and told Plaintiff this was like the situation where a terminated white employee, Bill Schrieber, lifted a cart completely off the ground and swung it around, broke a door and lied about it.  Jones claimed that this was the same thing Mr. Joseph did.  Mr. Joseph denied it was the same situation. Plaintiff's floor supervisor, Scott Foura, continued the conversation after Jones left.  Plaintiff indicated that this was two separate incidents. He did push the cart, he did not damage anything, no co-workers were in danger, this was done all the time, there was work to do, and he wanted to know when the policy changed.  Foura could not answer him.  Plaintiff had the impression from his body language he did not know the policy.

35.     Foura and manager, Blake De Matteo (Caucasian), later escorted him out of the plant an hour later and said he committed a "severe safety violation."

36.     On October 26, 2021, Plaintiff received a phone call from Sherry Cook and Chris Martin who informed Plaintiff he was being terminated.  Plaintiff said "what am I being terminated for, a safety violation? I've never had a safety violation in 35 years" and the response from Ms. Cook was "you are not being terminated for that." Plaintiff than asked "what am I being terminated for?" and she replied "we are not at liberty to discuss."

37.     The termination letter said, generically, he had been fired "for cause."

38.     On November 2, 2021, Plaintiff filled out a Pepperidge Integrity Report and complained of targeting and blatant discrimination.

39.     Subsequently, Plaintiff spoke briefly with Ms. Morris and emailed her to inform her he was wrongfully terminated.  She said she would refer his concerns to Ms. Angela Pack.

40.     Senior Human Resources Manager, Angela Pack, from Pepperidge Corporate had a conversation with Plaintiff after his termination. As a result of the Integrity Report, she said she would link two other Integrity complaints he had made.  She said she looked at the forklift training video and it talks about an unsecure load. She said she was not aware they fired him irresponsibly. Mr. Joseph responded that the safety procedures do not say anything about moving a golf cart. Ms. Pack got agitated, cut him off and said that she was not going to go back and forth about what the video means.  During the conversation, she said you weren't fired unjustifiably because of unsafe conduct but it was because of "code of conduct." Plaintiff's wife was listening on speaker phone.

41.     There was changing and/or pretextual reason(s) for firing Plaintiff, as moving a cart was an acceptable practice and procedure during his working for Pepperidge Farm at this plant and he did not violate any code of conduct and acted coolly and professionally at all times.

42.     Former Manager of Technical Support, Oliver "Tim" Conway, a 34-year Pepperidge manager who worked at the Denver plant, will testify that moving carts was an acceptable practice and procedure during his working for Pepperidge Farm at the Denver plant.

43.     Mr. Conway will testify that he has personal experience with the rules and practices related to lift trucks, having served on the safety committee on and off for years at Pepperidge.

44.     Mr. Conway will testify that moving objects in a timely fashion is an issue for employees because of making deadlines.

45.     Mr. Conway will say it is not only a permissible practice but an accepted practice for an employee to use a lift truck to move a cart that is obstructing progress of the lift truck.

6

46.    Mr. Conway will testify that he has known Anthony Joseph for years, and while Mr. Joseph is a "vocal" employee who is not timid and tends to stand up and advocate for himself and other employees, Mr. Joseph has always been professional and appropriate when bringing concerns to light in the workplace.

47.    Mr. Conway will testify that if a manager charged Mr. Joseph with a deficiency, Mr. Joseph's position was strong and it would be difficult for the manager to find anything false about his explanation of what occurred.

48.    Mr. Conway will testify that if you accuse Anthony Joseph of something, you better know what you are talking about.

49.    Mr. Conway will testify there were situations where some managers made different and inconsistent applications of the rules at the Pepperidge Plant to particular employees' disadvantage.

50.    Gene Fleck was a longtime supervisor at the Pepperidge Denver Plant who handled the forklift operator training and safety procedures program for at least 10 years.

51.    Mr. Fleck will testify that that there was no training that indicated that lift trucks were not allowed to move carts.

52.    Mr. Fleck will testify that moving carts is part of the practice so a lift truck can get through when it needs to.

53.    Mr. Fleck will testify that a termination for this reason alone, as opposed to something more serious, was unprecedented since it was a practice of workers to sometimes have to move carts in his experience.

54.    Mr. Fleck will testify that Anthony Joseph was someone who knew his facts, stood up for himself and other employees, and approached situations with appropriate professionalism.

7

55.    Susan Rollins is a long time Denver supervisor (color white, Race Caucasian) who retired in November 2021. She thought, given what she knows of people moving carts, the firing was "bogus."

56.    She indicates that people moved carts all the time, including herself, when it was necessary for production because of a time sensitive project. She is white and was never been disciplined.

57.    She indicates, before she left Pepperidge, there was no training that carts should not be moved. She recalls no plant wide announcement.

58.    She grew up in Coatesville and went to school with black people. She felt while she did not have a problem with blacks, Human Resources and some of management was selective in how they handled the application of the rules to black people and hispanics. She agreed with Plaintiff's comment that there seemed to be "selective racism" in this regard and she characterized racial sensitivity as "20 years behind."

59.    She will testify Plaintiff saw himself as an "Ambassador" for the minorities in the work place given his 35 years of service and he was not afraid to plainly tell Denver Human Resource officials they were not fairly applying the rules towards minorities.

60.    She will testify that Plaintiff was not popular with a number of managers and Denver HR representatives because Plaintiff advocated for himself, minorities in particular, and other workers in general and would tell management directly if they were unevenly treating minorities.

61.    She will testify that HR Representative, Chris Martin, does not need much to get her upset and Denver reps hated being told they were wrong.

62.    She attributes Plaintiff's firing to a possible pattern of trying to get rid of older employees.

63.    She will testify that Plaintiff told her numerous times he felt he had a bull's eye on his back and that he was being picked on unreasonably because of his race and expressing concerns about differing treatment because of race.

64.    She will testify that from her personal experience as a woman, as someone who started at Pepperidge at the age of 18 and served until retirement, that sometimes male management was over the line and had to be told so. Thus, she did not take offense to Plaintiff's outspoken nature. She had numerous backs and forth with Plaintiff who was always professional. She said he was usually right. He is smart and had his facts straight when he discussed an issue. He was not mean-spirited at all but was factual and persistent.

65.    Karen Cox was a set up operator at the Denver plant who worked at the Denver and Downingtown plants for 36 ½ years.

66.    Ms. Cox is black.

67.    Ms. Cox experienced racism at Pepperidge and also observed that there appeared to be two separate rules and practices for white and people of color (blacks, Hispanics, Asians). The minorities in the plant have an expression for it: "zero tolerance for some, but not for all." HR handled incidents with minorities differently than Caucasians. Generally, whites were treated better and were let off for fighting and racial infractions. On one occasion, she had the seniority to move to shipping and the supervisor said he didn't want any "big black niggers in my department." Plaintiff went to HR and then had to go to the NAACP to get him demoted. Some of the white employees circulated a Petition to get the discriminator's job back.

68.    She felt that Mr. Joseph was the mouthpiece for all the minorities and when he was fired, the prime advocate for minorities was gone.

69.     She will testify that it angered some managers, and certainly the Denver HR Representatives, that Anthony was an effective advocate, knew his facts, and was usually correct.

70.     The body language of Sherry Cook and Chris Martin around Plaintiff was poor and they ignored him.

71.     There was no rule, practice or anything verbalized about not moving carts until Plaintiff was fired.

72.     Plaintiff and Ms. Cox were friends. So, she noticed a change after his termination and was right there when Plaintiff was walked off the premisis. Ms. Cox saw how the cart was parked. It blocked Plaintiff's ability to do his job. Before that time, it was common practice to move carts that were in the way by either bumping into it or pushing it with the lift. After Plaintiff was fired, Pepperidge added to "Alchemy Sessions," which are meetings for QA, safety, diversity, and other major areas that are videos, not to move/push carts.

73.     Luis Lopez was a Department Leader of Plaintiff and former employee of Defendant. He would testify there was no policy about moving carts while Plaintiff was employed at Pepperidge.

74.     When Plaintiff was fired, Mr. Lopez felt the firing was unjust and further evidence of how minorities were treated differently at Defendant's work site.

75.     Mr. Lopez thought, in particular, minority men were fired for reasons where caucasions were not. This was particularly noticeable in "lock out, tag out" situations which involves the steps taken to de-energize equipment after use.

76.     Mr. Lopez noted on or about February 26, 2023, a white female near retirement age was not fired for this very serious, known mandatory terminable offense even though she had

a problematic record. However, Plaintiff was fired for something that others did regularly in the workplace despire having no prior safety violations.

77.    Mr. Lopez thought, in particular, Denver Human Resources was inconsistent and unfair in how they interpreted the rules towards minorities and men.

78.    Mr. Lopez thought that the Caucasion who placed the cart there in the first place committed a safety violation by blocking traffic and, therefore, should be at fault. Plaintiff should have been able to move the cart under those circumstances since the Caucasion who placed the cart there was not disciplined.

79.    Mr. Lopez felt that the progressive discipline system was ignored for Plaintiff considering he had no prior allegations of safety infractions, which Mr. Lopez relates is not a safety issue, as he and other non-supervisory employees have moved carts in this way without being disciplined.

80.    Mr. Lopez noted that a Caucasion female employee with many years of service dropped a forklift load in an incident on 4/25/22. She was not lift truck certified and had many problems in the workplace. Following the incident, nothing happened to her which showed significant inconsistency by Human Resources. When applied to Plaintiff's situation, this was an incidence of two people in a like situation being treated drastically differently.

81.    White people were not fired for pushing carts at the time Plaintiff was fired.

82.    Plaintiff raises a forklift incident that occurred on 4/25/22 as a comparator. The incident involed a Caucasian female employee who dropped a skid of brown sugar when retrieving from the racks.

83.    The employee was training in scaling and did not have a valid lift truck license.

84.    When the investigation was completed, the caucasian employee was not issued any disciplinary actions, while clearly violating safety policy.

85.     Another person fired at this plant for an incident with a cart and a fork lift was a white employee whose situation was wholly dissimilar to Plaintiff's in that he lifted (not pushed a small distance) a cart, moved or swung the cart across the room, slammed it into a wall or door causing damage, and lied about it.

86.     There was no warning after this employee was fired that there was a policy change on moving carts and there was no meeting to explain why he was fired.

87.     Ms. Cox will testify that given the current rules and practices, she thought the firing was wholly unwarranted and a pretext to get back at Plaintiff for his racial advocacy. (She did not know about Plaintiff calling Ms. Cook a "selective racist.")

88.     The firing is part-and-parcel to, and an example of, the discriminatory practice at Pepperidge. Mr. Joseph had been pointing out to Pepperidge management that there was a "selective racist" application of how corporate policies and discipline were handled at Pepperidge where the rules changed or had different than normal application depending on whether you were black/brown or white.

89.     Before Plaintiff's termination, at the Denver plant, employees were not disciplined for moving carts with lift trucks.

90.     Before Plaintiff's termination, the standard forklift training at the Denver plant did not include a prohibition against moving obstructing carts.

91.     Before Plaintiff's termination, firing someone for simply moving a golf cart that was in the way was not a reason to discipline or certainly not termination.

92.     Alternatively, Pepperidge Farm claims it adhered to a Progressive Disciplinary System, and Mr. Joseph was never warned he had any safety violations.

93.     There was a procedure of having "safety talks" about various safety violations that could occur but there was never a discussion concerning moving golf carts with fork lifts.

94.    There was no OHSA or safety "tool box meeting" after Mr. Schrieber was terminated for his egregious unsafe act or a safety memo that was distributed explaining the circumstances of his termination.

95.    Plaintiff 's termination was discriminatory compared to the way Caucasian employee are treated for similar offenses and was a further example of how black employees are treated differently at the Denver Plant.

96.    Alternatively, and additionally, Plaintiff's termination was in retaliation for his protected activity in raising racial complaints/concerns and his activity with Sherry Cook in September 2021 and prior to that with Pepperidge Farm management including Human Resources and participating in a Human Resources investigation of a racial incident and/or where race was an issue when he pointed out to Ms. Cook that Pepperidge HR treated whites and blacks differently in its application of the rules.

97.    Plaintiff alleges that his treatment would dissuade a reasonable worker from complaining of discrimination.

98.    Plaintiff also alleges that his age played a role in his treatment.

99.    Plaintiff's termination was a result of race, color, and age discrimination, and also retaliation for his opposition activity in the workplace.

100.    Defendant acted maliciously, oppressively, or in reckless disregard of Plaintiff's rights under federal law making it liable for punitive damages, or such similar state law punitive damage standard under state law.

101.    At all relevant times, the Defendant did not act in good faith, and the activity of terminating Plaintiff was done in consultation with Human Resources and second-line supervisors or above.

102.    Defendant's activity herein was not done pursuant to good-faith practices in anti-discrimination requiring Kolstad liability.

103.    No similarly-situated members of other protected classes were treated in this fashion.

104.    Plaintiff's counsel has incurred attorney's fees and costs which are recoverable under the actions brought in this litigation.

105.    Plaintiff experienced humiliation, embarrassment, and emotional distress as a result of Defendant's conduct.

106.    At all relevant times, Defendant, by and through the actions and inactions of its Human Resource officials, managers, agents, and employees, failed to act in good faith toward Plaintiff, and either (1) intentionally or recklessly ignored company non-discrimination and non-retaliation policies, or (2) was inadequately trained in recognition of reasonable accommodation requests or situations which result in the triggering of an interactive process.

107.    Defendant's management and Human Resource officials aided and abetted discrimination by Defendant under the PHRA by the aforesaid conduct.

108.    Plaintiff sustained damages as a result of Defendant's conduct, including lost compensation and benefits (including medical benefits, 401K and life insurance contributions, and other benefits), actual monetary losses, compensatory damages, liquidated damages, attorney's fees, costs and witness fees, and is entitled to equitable relief, including reinstatement, and an additional amount for the tax consequences of an award in Plaintiff's favor under the Third Circuit's ruling in Eshelman v. Agere Systems, Inc., 554 F.3d 426 (3d Cir. 2009).

109.    There is a causal link between the adverse actions and the employment actions herein.

## COUNT I

## VIOLATION OF TITLE VII

## RACE DISCRIMINATION

110.    Plaintiff realleges and incorporates the foregoing paragraphs as if they were set forth fully herein.

111.    Plaintiff is in protected classes.

112.    Plaintiff suffered adverse employment action(s) because of his race, ethnicity, national origin or color by Defendant and because he opposed and refused to participate in discrimination against other Black employees.

113.    There is a causal connection between the adverse employment action sustained by Plaintiff and his membership in a protected class.

114.    Plaintiff has suffered damages.

WHEREFORE, Plaintiff demands the following relief:  (1) wages, employment benefits or other compensation denied or lost by such violation, including front wages; (2) equitable relief such as rehiring; (3) a reasonable attorney's fee; (4) the employee's expert witness fee, if any; (5) damages for pain, suffering, humiliation, and emotional distress; (6) punitive damages; (7) other costs of the action; (8) interest; and (9) an additional amount for the tax consequences for an award in Plaintiff's favor under the Third Circuit's Eshelman doctrine.

## COUNT II

## VIOLATION OF TITLE VII

## RETALIATION

115.    Plaintiff realleges and incorporates the foregoing paragraphs as if they were set forth fully herein.

116.     Plaintiff is in protected classes.

117.     Plaintiff suffered adverse employment action(s) because he opposed and refused to participate in discrimination against other Black employees.

118.     Plaintiff had a good-faith, reasonable belief that his conduct was protected activity.

119.     There is a causal connection between the adverse employment action sustained by Plaintiff and his protected activity herein.

120.     Plaintiff has suffered damages.

WHEREFORE, Plaintiff demands the following relief:  (1) wages, employment benefits or other compensation denied or lost by such violation, including front wages; (2) equitable relief such as rehiring; (3) a reasonable attorney's fee; (4) the employee's expert witness fee, if any; (5) damages for pain, suffering, humiliation, and emotional distress; (6) punitive damages; (7) other costs of the action; (8) interest; and (9) an additional amount for the tax consequences for an award in Plaintiff's favor under the Third Circuit's <u>Eshelman</u> doctrine.

## COUNT III

### VIOLATION OF SECTION 1981

### DISCRIMINATION

121.     Plaintiff realleges and incorporates the foregoing paragraphs as if they were set forth fully herein.

122.     Plaintiff is in a protected class, Black.

123.     Plaintiff suffered adverse employment action(s) by Defendant because of his race.

124.     There is a causal connection between the adverse employment action sustained by Plaintiff and his membership in the protected class.

125.     Plaintiff has suffered damages.

WHEREFORE, Plaintiff demands the following relief: (1) wages, employment benefits or other compensation denied or lost by such violation, including front wages; (2) equitable relief such as rehiring; (3) a reasonable attorney's fee; (4) the employee's expert witness fee, if any; (5) damages for pain, suffering, humiliation, and emotional distress; (6) punitive damages; (7) other costs of the action; (8) interest; and (9) an additional amount for the tax consequences for an award in Plaintiff's favor under the Third Circuit's <u>Eshelman</u> doctrine.

## COUNT IV

### VIOLATION OF SECTION 1981

### RETALIATION

126.     Plaintiff realleges and incorporates the foregoing paragraphs as if they were set forth fully herein.

127.     Plaintiff is in a protected class, Black.

128.     Plaintiff suffered adverse employment action(s) because he opposed and refused to participate in discrimination against other Black employees.

129.     Plaintiff has a good-faith, reasonable belief that his conduct was protected activity.

130.     There is a causal connection between the adverse employment action sustained by Plaintiff and his protected activity herein.

131.     Plaintiff has suffered damages.

WHEREFORE, Plaintiff demands the following relief: (1) wages, employment benefits or other compensation denied or lost by such violation, including front wages; (2) equitable relief such as rehiring; (3) a reasonable attorney's fee; (4) the employee's expert witness fee, if any;

(5) damages for pain, suffering, humiliation, and emotional distress; (6) punitive damages; (7) other costs of the action; (8) interest; and (9) an additional amount for the tax consequences for an award in Plaintiff's favor under the Third Circuit's Eshelman doctrine.

## COUNT V

## PENNSYLVANIA HUMAN RELATIONS ACT

### RACE DISCRIMINATION

132.    Plaintiff realleges and incorporates the foregoing paragraphs as if they were set forth fully herein.

133.    Plaintiff is in a protected class, Black.

134.    Plaintiff suffered adverse employment action(s) because he opposed and refused to participate in discrimination against other Black employees.

135.    Plaintiff has a good-faith, reasonable belief that his conduct was protected activity.

136.    There is a causal connection between the adverse employment action sustained by Plaintiff and his protected activity herein.

137.    Plaintiff has suffered damages.

WHEREFORE, Plaintiff demands the following relief:  (1) wages, employment benefits or other compensation denied or lost by such violation, including front wages; (2) equitable relief such as rehiring; (3) a reasonable attorney's fee; (4) the employee's expert witness fee, if any; (5) damages for pain, suffering, humiliation, and emotional distress; (6) punitive damages; (7) other costs of the action; (8) interest; and (9) an additional amount for the tax consequences for an award in Plaintiff's favor under the Third Circuit's Eshelman doctrine.

## COUNT VI

## PENNSYLVANIA HUMAN RELATIONS ACT

## RETALIATION

138.    Plaintiff realleges and incorporates the foregoing paragraphs as if they were set forth fully herein.

139.    Plaintiff is in a protected class, Black.

140.    Plaintiff suffered adverse employment action(s) because he opposed and refused to participate in discrimination against other Black employees.

141.    Plaintiff has a good-faith, reasonable belief that his conduct was protected activity.

142.    There is a causal connection between the adverse employment action sustained by Plaintiff and his protected activity herein.

143.    Plaintiff has suffered damages.

WHEREFORE, Plaintiff demands the following relief:  (1) wages, employment benefits or other compensation denied or lost by such violation, including front wages; (2) equitable relief such as rehiring; (3) a reasonable attorney's fee; (4) the employee's expert witness fee, if any; (5) damages for pain, suffering, humiliation, and emotional distress; (6) punitive damages; (7) other costs of the action; (8) interest; and (9) an additional amount for the tax consequences for an award in Plaintiff's favor under the Third Circuit's Eshelman doctrine.

## COUNT VII

## AGE DISCRIMINATION IN EMPLOYMENT ACT

## AGE DISCRIMINATION

144.    Plaintiff realleges and incorporates the foregoing paragraphs as if they were set forth fully herein.

145.    Plaintiff is in a protected class because of his age, 59 years old at the time of his termination.

146.    Plaintiff was terminated because of his age or was treated differently or disparately by Defendant from similarly-situated younger individuals, including but not limited to those who are not in a protected age class.

147.    Plaintiff suffered adverse employment action(s) by Defendant because of his age, including being terminated.

148.    Plaintiff has suffered damages caused by Defendant.

149.    Plaintiff is entitled to liquidated damages.

WHEREFORE, Plaintiff demands the following relief from Defendant.: (1) wages, employment benefits or other compensation denied or lost by such violation; (2) front pay wages; (3) equitable relief such as rehiring; (4) a reasonable attorney's fee; (5) the employee's expert witness fee, if any; (6) rehire to Defendant to his former position (with all back and future benefits he would have been entitled to); (7) liquidated damages; (8) an additional amount for the tax consequences for an award in Plaintiff's favor under the Third Circuit's ruling in Eshelman v. Agere Systems, Inc., 554 F.3d 426 (3d Cir. 2009); (9) other costs of the action.

## COUNT VIII

## PENNSYLVANIA HUMAN RELATIONS ACT

## AGE DISCRIMINATION

150.     Plaintiff realleges and incorporates the foregoing paragraphs as if they were set forth fully herein.

151.     Plaintiff is in a protected class because of his age, being 59 years old at the time of his termination.

152.     Plaintiff was terminated because of his age or was treated differently or disparately by Defendant from similarly-situated younger individuals, including but not limited to those who are not in a protected age class.

153.     Plaintiff suffered adverse employment action(s) by Defendant because of his age, including being terminated.

154.     Plaintiff has suffered damages caused by Defendant.

WHEREFORE, Plaintiff demands the following relief from Defendant: (1) wages, employment benefits or other compensation denied or lost by such violation; (2) front pay wages; (3) equitable relief such as rehiring; (4) a reasonable attorney's fee; (5) the employee's expert witness fee, if any; (6) rehire to Defendant to his former position (with all back and future benefits he would have been entitled to); (7) damages for pain, suffering, humiliation, and emotional distress; (8) an additional amount for the tax consequences for an award in Plaintiff's favor under the Third Circuit's ruling in Eshelman v. Agere Systems, Inc., 554 F.3d 426 (3d Cir. 2009); and (9) other costs of the action.

Respectfully submitted,

Date: _March 29 2024_    BY: _____

Edward C. Sweeney, Esquire
WUSINICH, SWEENEY & RYAN, LLC
102 Pickering Way, Suite 403
Exton, PA  19341
(610) 594-1600
esweeney@wspalaw.com
*Attorney for Plaintiff*

# EXHIBIT A



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

Philadelphia District Office
801 Market St. Suite 1000
Philadelphia, PA 19107
(267) 589-9700
Website: www.eeoc.gov

## <u>DETERMINATION AND NOTICE OF RIGHTS</u>
(This Notice replaces EEOC FORMS 161 & 161-A)

Issued On: 07/21/2022

To: Anthony A. Joseph
604 Gregg St
Shillington, PA 19607

Charge No: 530-2022-02783        Anthony A. Joseph v Pepperidge Farm Denver

EEOC Representative and phone#:   Legal, (267) 589-9707

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 530-2022-02783.

On behalf of the Commission

July 21, 2022

**Karen McDonough**
**Deputy District Director**

**Cc:**
John  Connelly, Esq.
Campbell Soup Company
john_connelly@campbells.com

Rose  Isard, Esq.
Campbell Soup Company
Rose_Isard@campbellsoup.com

Edward C Sweeney, Esq.
ESweeney@wspalaw.com

**Please retain this notice for your records.**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANTHONY JOSEPH<br>604 Gregg Street<br>Shillington, PA 19607 | : CIVIL ACTION – LAW<br>:<br>: NO. 5:22-cv-04049-KBH<br>: |
| Plaintiff, | :<br>: |
| vs. | :<br>: |
| PEPPERIDGE FARM INCORPORATED<br>595 Westport Avenue<br>Norwalk, Connecticut 06851 | : JURY TRIAL OF 12 DEMANDED<br>:<br>: |
| Defendant. | :<br>: *Electronically filed* |

### CERTIFICATE OF SERVICE

I hereby certify that on the date noted below, Plaintiff's Amended Complaint was electronically filed with the Clerk within the time and in the manner prescribed by the Federal Rules of Civil Procedure and Local Rules, and that a copy was served upon all counsel of record via the Court's electronic filing system.

Date: March 29, 2024          By: _____

Edward C. Sweeney, Esquire
WUSINICH, SWEENEY & RYAN, LLC
102 Pickering Way, Suite 403
Exton, PA 19341
(610) 594-1600
esweeney@wspalaw.com
*Attorney for Plaintiff*